Welcome to the first day of our four-day Jacksonville sitting. Judge Brasher and I are pleased to be here in the hometown of Judge Cho Flatt. Thank you for hosting. Before we get going, just a couple of rules of the road. One, please know, most importantly, that we've read your materials. We've read the briefs, the cases that you've cited to us, the underlying record materials. So don't waste your own time. You have limited time before us. Don't waste it giving us a bunch of factual and procedural ramp-up. We don't need it. Just get straight to the issue that you think drives a decision in your favor. Two, you'll understand the traffic light system here. Green is go, yellow is caution, and red, aspire to stop. I'm not the world's greatest interrupter and trapdoor opener, but I will seek to read my body language. When the red light is on, your time is up. All right, very well. With that, let's call the first case. This is United States v. Chun and Tendre. 22-14192. We have Mr. Wise for whom? Tell me. For Dr. Chun. And Ms. Berrar? Berrar for Tendre. Okay, very well. Mr. Wise, you go in first. Okay, fire away. Members of the Court, my name is Jervis Wise and I have the pleasure of representing Appellant Stephen Chun who is present in the gallery this morning. And I'd like to reserve three minutes for rebuttal if I may. And Members of the Court, this is a case where the government failed to present sufficient evidence that would permit a reasonable trier of fact to find that Dr. Chun ever had any specific intent to do anything unlawful. He was a pawn of the INSIS scheme and he was targeted because he was so successful in his practice. He was not prosecuted along with the architects of the scheme in the District of Massachusetts. He was, of course, prosecuted separately in Tampa. The evidence established that he was paid a market rate as a speaker on behalf of subsist. It was commensurate with his experience and with his successful practice. The evidence also established that the medication subsist was, at the time, the superior turf medication on the market. All of the prescriptions at issue were medically necessary. And the evidence established that even the INSIS executives were unhappy with Dr. Chun's prescription writing, which I believe is clear, a clear indication that he was not being paid bribe to prescribe, as the government said many times during the trial. Alec Berlikoff sent emails to executives within the company, salespeople within the company, stating they weren't happy with the prescriptions that Dr. Chun was writing. Mr. Babbitt. I mean, there's no question this is a circumstantial evidence case. I mean, what do you say about the government's chart on page 16 of their brief, where it shows sort of his prescription writing goes dramatically up over time, especially, it seems kind of, I mean, it seems like a jury could say, look, it seems to go up when the girlfriend is hired? Well, two things, Your Honor. One is this was a new medication under the market. And Dr. Chun had many established patients who had been using two other medications over time. And this is a situation where the product is taking on market share as it develops over time. And I think the evidence was sufficient to support that. The other thing I think is important to note with regards to the girlfriend is the girlfriend specifically wanted Dr. Chun not to know she was being hired. There's no indication that Dr. Chun had any say whatsoever in her hiring. I think it's more evidence, again, of INSIS trying to improperly influence him. But there's no evidence that suggests Dr. Chun ever took part in that, ever had any unlawful intent. And I guess, and I don't want to interrupt you too much, but I mean, to me, this issue kind of boils down to we've got a conspiracy to basically bribe the doctor. And your argument is, well, the doctor didn't really know that conspiracy was going on and he just kind of wasn't bribed. I mean, you know, isn't that just kind of for a jury to decide whether he knew about it or not? I mean, it's just kind of, you've definitely got some evidence on your side that suggests he didn't. But I mean, the government has a lot of circumstantial evidence that it seems like he knew what was going on. Well, I don't believe they did. I think that the government tried to spin it in that direction. But when you actually go back the layers and look at the evidence that's presented, I don't believe there is sufficient evidence that will permit a juror to find it. What about the piece of evidence where your client agreed, Berlakov's proposition, we're going to pay you and you're going to prescribe the drug? Well, Berlakov himself said he knew that he couldn't influence Dr. Chun. And he did not explain how this allegedly came about. He didn't say anything that Dr. Chun actually said in response to what he was saying. And I think what's really important is, based on what Berlakov says, we're going to pay you to prescribe the medication. It's, of course, any person who would be participating in the speaker program, which is a legitimate practice within the industry, would be expected to prescribe the medication. But there was never any evidence that it was actually tied, that we're only going to pay you if you prescribe or that you're going to get paid more if you prescribe. Yeah, and that's where I go, you know, I just look at this chart on page 16 and it just, you know, his speaker fees as they go up to where he's making $4,000 and he's got a little bit of prescriptions and then he goes up to where he's making $39,000 a year and he goes up a lot in prescriptions. I mean, once again, this is just a circumstantial evidence case, but it just seems like the jury could say, you know what, we've got an admitted conspiracy going on here to bribe him and it looks like it was successful. And I think that really the explanation is that it's the time, it's the time. Yeah, and that sounds like a great argument and it just seems to me the jury just rejected that argument, right? I see my time is coming short. We had two other issues that I believe were critical as well that are briefed, obviously, but the juror questions that were answered, I believe, were obviously problematic and improper answers. Okay, very well, thank you. Ms. Barrow? May it please the Court, Darlene Barrow, I have the pleasure of representing Mr. Tendre, who is here. Your Honors, we have a similar situation in Mr. Tendre's case. There is no doubt, as the Court pointed out, that there was a conspiracy. However, Mr. Tendre's involvement in that conspiracy does not constitute a crime. Mr. Tendre was hired six months after Dr. Chung was enrolled in the speaker program. The program was already set up. There were a number of text messages that indicate that INCIS was very unhappy with Mr. Tendre's performance because he wasn't doing enough of these activities. I know that there is a stumbling block in this case because Mr. Tendre put down the names of attendees at these meetings that were not actually attendees. However, Your Honor, he had gotten sign-up sheets before the event for doctors and pharmacists that said that they would attend. He planned for them. He ordered food for them. When they didn't show up, he shouldn't have written that they were in attendance. However, that doesn't have any relationship to Dr. Chung and his speaking engagement. For Mr. Tendre, it would have been much better if doctors and pharmacists would have shown up because his base salary of $80,000 had the added incentive of commissions. If more doctors and pharmacists came to these meetings and they were able to be influenced that subsist was a good medication and that they should prescribe it, he would have made more money. He had no incentive to have these seminars be shams. It's just unfortunate that people didn't always attend. Please go ahead. What about in addition to the forged signatures, the fact that he himself said these programs really weren't any good and he scheduled them specifically at restaurants that Chun liked? Doesn't that begin to form a mosaic of evidence of the sort that Judge Brasher was talking about earlier that a jury could find convincing? Your Honor, Dr. Chung and Mr. Tendre were friends. They were friends from before that Mr. Tendre became employed. There is no doubt that Mr. Tendre wanted to find places that Dr. Chung would be happy to frequent or to attend a dinner. He wanted to keep Dr. Chung as a customer, but Dr. Chung had thousands of patients, I think 1,000 patients a month. Out of these patients, only 34 were identified as patients that were getting these prescriptions. I believe out of the 34, 31 of them were cancer patients that were already on similar prescriptions. For Mr. Tendre to try to influence Dr. Chung to consider subsist as a medication instead of one of the other medications, that was his job. There was nothing inappropriate about that. Let me ask you, so he testified, right? Tendre testified? Yes, sir. We've got a lot of case law, which wasn't discussed a lot in the briefs, but just say, look, when a defendant takes the stand and says, basically, I didn't do it, there was no crime committed, that the jury can look at him and disbelieve him. Isn't that what happened here? He gave us the same explanations that you're giving us, and the jury just said, you're a liar. Well, Your Honor, I think that there were certain things that were not perhaps properly considered. For example, Your Honor had mentioned- I guess here's the question. Can we somehow reverse this conviction on sufficiency of the evidence without saying that the jury just got his credibility wrong, that the jury should have credited his testimony, and they didn't? Well, there are certain things, Your Honor, that I don't think were properly understood by the jury. For example, there was a position that Mr. Tendre perhaps was encouraging Dr. Chung to prescribe higher doses of the medication. In reality, the higher doses were cheaper because they could be divided in two, and the price for each unit was cheaper than if you bought them individually. I'm not sure that the jury ever got that. There was a jury question about unit price, and it was never clearly explained. Okay, very well. Let's hear from the government. Mr. Lieberman? Good morning, Your Honors. Dave Lieberman for the United States with me at table as Assistant United States Attorney Kelly Howard Allen, who tried the case below. I'll follow my colleague's lead and focus on the conspiracy claims and going to a question by Judge Brasher. We view this as a jury question. A reasonable jury, viewing the evidence in light most favorable to the government, could find that both defendants, Dr. Chung and Mr. Tendre, knowingly and voluntarily entered into this conspiracy money to Dr. Chung in exchange for Chung's prescribing. I'll start with Dr. Chung, and I'd like to just point out five quick buckets of evidence, which I think support the jury's finding here. I'll start with the testimony. Judge Newsom, your question flagged it. The Vice President of Sales, Alex Berlikoff, testified that he met with Dr. Chung in August 2012. Berlikoff said, I have $100,000 speaker budget for you, Chung, and Berlikoff verbally agreed. The jury was entitled to credit that evidence as suggestive of a conspiracy. That's bolstered by four additional buckets of evidence. Some of your questions, Your Honors, goes to the numbers. The chart shows an increase in Chung's prescribing for sepsis over the course of the conspiracy. There was also testimony that the company was tracking all the doctors who prescribe sepsis, apart from the government's evidence. And the jury heard testimony that, according to the company's own tracking, Dr. Chung, at the close of 2012, 1.6 prescriptions per week. 2013, it jumps to 9.8 prescriptions per week. 2014, over 10, as he is getting more and more speaker payments. That correlation is circumstantial evidence that the jury was entitled to credit as evidence of a conspiracy. We have the close working relationship between Dr. Chung and the Mr. Tondre. Text messages where Mr. Tondre is encouraging Dr. Chung to prescribe more sepsis. Dr. Chung updating his sales rep at eight prescriptions already today. I'm looking for more sepsis patients. So that close working relationship, more evidence of conspiracy. Fourth bucket, the jury could credit the evidence that Dr. Chung was switching patients who were happy on their old medications onto sepsis. What was the difference in the price of the two? The difference in the price between the... There's a big difference in the price between the old. Those patients were paying. Your Honor, I can't recall off the top of my head what the evidence was of the price of the old. Well, there was a differential though. It was profitable to shift. Yes, certainly for the company. Yes, right. And then there was evidence that the company, part of this conspiracy was to get doctors to switch their patients from the competitor drug to sepsis. And the last bucket, the fifth bucket, is that where Dr. Chung brags to a fellow doctor at a sepsis event that he's the highest paid speaker in the country for his prescription writing. Again, evidence that the jury could credit that Dr. Chung is in on this agreement to accept these payments in exchange for prescribing. Both parties have cited the First Circuit's decision in the Clough case, which similarly involved Dr. 371 anti-kickback conspiracy. And much of the evidence that we presented here mirrors the evidence that the First Circuit panel credited in affirming the verdict in that case on sufficiency. Direct testimony about a dinner meeting between the vice president of sales and the doctor, close working relationships between the doctor and the sales reps, and messages about increasing prescription numbers, increasing sepsis prescriptions coinciding with more speaker payments. And there, as in Clough as here, we have a doctor switching patients off competitors to sepsis even though the patients were happy with their old medications. What was true in Clough is true here. The jury had sufficient evidence. The arguments that we've heard this morning with respect to Dr. Chung are jury arguments, which the jury was free to credit, but the jury did not. Could you address just an issue I have just generally with this, because I'm sure you've thought about this, is especially during this time period, the speaker programs and the efforts to sort of convince doctors to prescribe one medication, save another. Like, this was the way these drug companies worked, as my understanding. Like, what's the difference between, in your mind, between sort of normal business practices that are not illegal and illegal conduct that violates the statute? Largely intent, Your Honor. We have a conspiracy, specific intent crime. So if a medical provider knowingly and voluntarily agrees to prescribe a medication in exchange for remuneration, in this case payments, that's criminal under the anti-kickback statute. That stringent mens rea requirement will sort the doctors who are just ignorant or just trying to honestly prescribe, not affected by whatever marketing techniques a pharmaceutical company is engaging in, with the type of criminal conduct here. It's the agreement to accept money in exchange for prescribing. That's what the jury found in this case. And turning to, unless you have further questions about Dr. Chung, briefly on Mr. Tendre, the jury viewing the evidence in the light most favorable to the government, could also find that he was in on this agreement. Apologies, Your Honor, we did not discuss the line of 11th Circuit case law, but it is entrenched in this circuit. When a defendant testifies, a jury can weigh the defendant's credibility, is entitled to disbelieve him, and use that disbelief as evidence of the charged crime. The problem, from my perspective, on Tendre, is I don't see how we could reverse the conviction without effectively just saying the jury's credibility determination was incorrect, since he denied having the intent to do any of this. I mean, it seems like we would have to say that the jury just, you know, we can't look at him testify and determine whether his testimony was credible ourselves, so it's just like, we would just have to do that, right, to reverse the conviction? That's correct, Your Honor, and under Rule 29, that type of credibility judgment is vested with the jury, and the jury had ample reason to make that factual finding here. There was evidence from the business liaison, Mr. Rosario, that Tendre, and he discussed the link between the speaker programs and the prescriptions. Tendre admitted on the stand that these speaker programs were shams, they were ignorant, he was fabricating sign-in sheets. We have text messages where Tendre is pushing Dr. Chun to prescribe more sepsis, including the more prescriptions the better, help him get more sepsis, and finally, we have a strong financial motive. Tendre's compensation was pegged to Dr. prescribing. There was testimony, this is at docket entry 237, page 282, quote, the more Chun over $700,000. Yeah, I guess, I guess that, and that goes to my, and I don't want to belabor the point, but I mean, if Tendre can be convicted for being a salesman whose compensation is linked to his success in selling the drug, if that's enough to convict him, then it seems like there's not much difference between just what people normally do and a federal crime. So it's a constellation of evidence. It's the fact that he understood that the speaker programs and the payments were linked, and he admitted on the stand that the speaker programs, sort of the, the educational events that the company was supposedly paying Dr. Chun for, and that he, Tendre, was facilitating, he said that they were ignorant programs. There was no educational component. So from that, the jury could find that he's in on the, he's in on the secret. He had to be paying, I see what you're saying. So they had to be paying him for something, and if there weren't any, there's no educational component to the programs, and no other doctors or pharmacists showed up to hear him speak, then what were they doing? And Tendre is fabricating the sign-in sheets, family members are appearing. So all of this, in this case, is sufficient for the jury to reach a reasonable conclusion that Tendre was in on the conspiracy. The sign-up sheet was just to have evidence that there was a real thing and not a sham. Is that what the purpose of the sign-up sheet was? Yes. So, well, in the government's view, and the jury was entitled to find this, the sign-up sheets were just superficial. It was designed to make the program look legitimate when it was not, and to hide the fact that this was just a conduit to pay the doctor money. It wasn't a real educational event. There have, I have five minutes left. There have been a number of other claims raised in this case. Could you address the jury questions and the way the district court handled jury questions, and in particular, the calculation of per-unit costs? Yes. So the jury handed up a note saying we would, we are looking for summary charge to handle, to calculate the per-unit cost of the different sepsis doses, which went from 100 micrograms all the way up to 1,600. And after conferring with the parties, the district court said you might consult exhibit 600 and excerpt. Please consider, you may or may not find all these exhibits helpful. That response did not trench on the jury's fact-finding function. It was accurate because the jury could, that those sheets had the numbers to calculate the per-unit cost. It was responsive. The jury was looking for specifically summary charts. It was neutral. The district court did not tell the jury that the exhibits would be helpful, did not tell the jury how it might engage in the calculations. Counsel, my understanding is that after the court read, gave the instructions, excuse me, the questions to counsel, then they had a discussion. Yes, your honor. Then the court said I'm going to tell him this. Yes. No objections. Your honor, there was, the defense asked for a separate response, which was. No, it wanted a separate one, but I'm talking about the one that judge gave. I believe that they preserved an objection to what their preferred response, which was there is no data to answer that question. They preserved it by asking for something else. Yes, I think so. I think so. But the defense proposed response, there is no data to answer that question. It's just factually wrong. There was data that the government admitted into evidence from which the jury could make these calculations. This court has said this is an abuse of discretion review. I've looked at the case law all over the country. As long as the district court doesn't trench on the jury's fact-finding function, there's no abuse of discretion, and I'm hard-pressed to see it here. Final point is even if there was some error in the wording, it was harmless because all that the exhibit showed, which was there was substantial evidence, it coincided with exhibit 286, which is cited in the reply briefs, that the price per unit goes up when the dose goes up. And there was testimony onto that. The jury is probably just trying to check that testimony and confirm from the incest witnesses that we got paid more when the focus on the second jury question. At the end of the day, this is an abuse of discretion review. The district judge didn't tell the jury how to consider the evidence. The district judge didn't tell the jury that this exhibit was important. It was simply responding to a jury note saying, can we help locating the summary charts that would allow us to do this calculation? And the judge's response, exhibit 600, was accurate, and it did not tell the jury how to weigh that evidence. No abuse of discretion. There's a second jury note. There's also a sentencing claim in this case. I'll just pause here and ask if members of the panel have any questions about any of the other arguments or any of the other claims raised in this case. I'll hand back my time. The government asks that the court affirm. Very well. Thank you so much. Mr. Wise, you've got three minutes of rebuttal time remaining. Thank you, Your Honor. Going back to the jury question issue that was just addressed, this is a situation, members of the court, where the district court did actually invade the fact finding problems of the jury. I think that's particularly true of the text message issue. The reason I say that is the text messages are admitted into evidence. The text message is the never discussed until closing argument. And Judge Jung has, I believe, a standard practice of admitting everything up front, and then that's that. And that's what happened here. So it's admitted, never brought up until closing argument. And then it's argued that these text messages are forwarded text messages, arguing that Tendre was forwarding them from, allegedly, Dr. Chung. But there's been no evidence, and there was no evidence presented that they actually were forwarded text messages. They say somewhere, from Chung, which seemingly the sender would have written, but there were no records presented to show that they were forwarded. It doesn't have the FW to suggest they were forwarded. So when the jury asks the question, they're clearly trying to figure out what are these forwarded text messages that the government's referring to in closing. And they're asking, which ones are the forwarded ones? How do we figure that out? And the problem the district court's question is he specifically directed them to exhibits. And that leads the jury to believe, well, I guess these must have been forwarded text messages. And by happenstance, the jury had been out for two days. After the judge answered that question, they bring a verdict back pretty quickly, relatively speaking. I think it was clearly, again, I believe that the per unit cost was problematic in the answer, too. But the text message answer was particularly problematic because it did suggest to the jury, yes, these are forwarded text messages. What about the fact that when the court sent them over, he attached like two question marks to his response? I mean, it seems like that's not quite, I guess, as explicit as the caveat with respect to the per unit cost response where he says, look, you may or may not find this useful. But the two question marks suggests to me that he's saying like, well, I don't know, you can do with this what you want to. Perhaps. I can tell you, in all candor, I never viewed it that way. And it's hard, we can't know how the jurors responded to that. And that's why I think the judge going beyond anything more than telling the jury, you have all the evidence, please continue your deliberations, is problematic for that reason. We don't know how the jury interpreted that. But one very obvious interpretation or clear interpretation could be that the jury believed the judge is telling us these were the forwarded text messages. And going back to your honors question, Dr. Chun did specifically object to the jury being instructed in any more detail than you have to rely on your own memory and the evidence that's in the jury room. I believe that issue was properly preserved. And I see my time is running out. Thank you. Well, thank you so much. Ms. Barrow, you've got two minutes. Just briefly, I'd like to speak with regards to the increase in the prescriptions for subsist. One of the things that was presented in the trial is that in the beginning, Dr. Chun was providing coupons to patients to try out the subsist to see if it would be effective for them. So that, of course, did not result in a sale because it was a free coupon. So as the patient decided that they did like the medication, then they started purchasing it. So over that period of time where it looks like sales are increasing, the coupons were also one reason why they were increasing. And with regards to any type of a loss, I think one of the things that we need to consider is that all of these patients, the 34 of them, received the medication. So they received a value. It's not as if the prescriptions were written and no one received a value. Each one these patients received a value, which I think should go to the loss. Additionally, as the court pointed out, Mr. Tendre was doing probably the same thing as every pharmaceutical representative does, and that is to try to promote their product. He did not organize the speaker events. They were organized six months prior to his employment. He wasn't doing a particularly good job of following through with them. He made no decisions as far as how educational they were to be. They were already set up. There was testimony, however, that people that did attend the seminar did find it to be of some value with regards to how the medication worked. I believe it was the pharmacist, Patel, that said that he received valuable information during the time that he attended these seminars. And as far as the issue about the unit price, I think a jury would have seen that there was no desire to deceive by prescribing the higher dosage if they had realized that the per unit price would have been less, and that was available in one of the government's Exhibit 286. Okay. Very well. Thank you so much. That case is submitted, and we'll move on to the second case of the day, United States.